IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

GENEVA FLETCHER,       )
                              )
      Plaintiff,        )
                              )
     vs.             )        4:17-cv-02023-LSC
                              )
NANCY BERRYHILL,      )
Commissioner of          )
Social Security,          )
                              )
      Defendant.      )

**MEMORANDUM OF OPINION**

## I.    Introduction

The plaintiff, Geneva Fletcher, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her applications for a Period of Disability, Disability Insurance Benefits ("DIB"), and Social Security Income ("SSI"). Ms. Fletcher timely pursued and exhausted her administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).

Ms. Fletcher was 38 years old at the time of the Administrative Law Judge's ("ALJ's") decision. (Tr. at 12, 58.) She has an eighth grade education and past work experiences as a housekeeper, a paint mixer, a laborer, a quality department

helper, and certified nursing assistant. (Tr. at 58, 63, 74.) Ms. Fletcher claims that she became disabled on July 15, 2013, as a result of bipolar disorder, anxiety disorder, mood disorder, post-traumatic stress disorder, personality disorder, and a seizure disorder. (Tr. at 108-09, 135-48.)

The Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and thus eligible for DIB or SSI. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The evaluator will follow the steps in order until making a finding of either disabled or not disabled; if no finding is made, the analysis will proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step requires the evaluator to determine whether the plaintiff is engaged in substantial gainful activity ("SGA"). *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the plaintiff is not engaged in SGA, the evaluator moves on to the next step.

The second step requires the evaluator to consider the combined severity of the plaintiff's medically determinable physical and mental impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 will result in a finding

of not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The decision depends on the medical evidence contained in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971) (concluding that "substantial medical evidence in the record" adequately supported the finding that plaintiff was not disabled).

Similarly, the third step requires the evaluator to consider whether the plaintiff's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the criteria of a listed impairment and the durational requirements set forth in 20 C.F.R. §§ 404.1509 and 416.909 are satisfied, the evaluator will make a finding of disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the plaintiff's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluator must determine the plaintiff's residual functional capacity ("RFC") before proceeding to the fourth step. *See id.* §§ 404.1520(e), 416.920(e). The fourth step requires the evaluator to determine whether the plaintiff has the RFC to perform the requirements of his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the plaintiff's

impairment or combination of impairments does not prevent him from performing his past relevant work, the evaluator will make a finding of not disabled. *See id.*

The fifth and final step requires the evaluator to consider the plaintiff's RFC, age, education, and work experience in order to determine whether the plaintiff can make an adjustment to other work. *See id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the plaintiff can perform other work, the evaluator will find him not disabled. *Id.*; *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g). If the plaintiff cannot perform other work, the evaluator will find him disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

Applying the sequential evaluation process, the ALJ first found that Ms. Fletcher met the insured status requirements of the Social Security Act through the date of her decision. (Tr. at 17.) She further determined that Ms. Fletcher has not engaged in SGA since the alleged onset of her disability. (*Id.*) According to the ALJ, Plaintiff's bipolar disorder and anxiety disorder are considered "severe" based on the requirements set forth in the regulations. (*Id.*) However, she found that these impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18.) The ALJ determined that Ms. Fletcher has the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations: she should never climb ladders,

ropes, and scaffolds; she should never be exposed to unprotected heights or hazardous machinery; she should be limited to unskilled work with few workplace changes and no direct contact with the general public; and she should be limited to only occasional contact with coworkers. (Tr. at 19.)

Next, the ALJ obtained the testimony of a Vocational Expert ("VE") and determined at step four of the sequential evaluation process that Plaintiff is capable of performing her past relevant work as a housekeeper, department helper, and certified nursing assistant. (Tr. at 21-22). The ALJ concluded her findings by stating that Plaintiff has not been under a "disability," as defined in the Social Security Act, from the alleged onset date through the date of the decision. (Tr. at 22.)

## II.    Standard of Review

This Court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). This Court gives deference to the factual findings of the Commissioner, provided those findings are

supported by substantial evidence, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

Nonetheless, this Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)). "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the proof preponderates against the Commissioner's decision, it must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400 (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

However, no decision is automatic, for "despite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881,

883 (11th Cir. 1984)). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III. Discussion

Ms. Fletcher alleges that the ALJ's decision should be reversed and remanded because the ALJ did not properly evaluate the opinions of W. Hardin Coleman, M.D., her primary care physician, and Mary Arnold, Psy.D, the consultative examiner.

The ALJ must articulate the weight given to different medical opinions in the record and the reasons therefore. *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). The weight afforded to a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

Within the classification of acceptable medical sources are the following different types of sources that are entitled to different weights of opinion: 1) a treating source, or a primary physician, which is defined in the regulations as "your physician, psychologist, or other acceptable medical source who provides you, or

has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you;" 2) a non-treating source, or a consulting physician, which is defined as "a physician, psychologist, or other acceptable medical source who has examined you but does not have, or did not have, an ongoing treatment relationship with you;" and 3) a non-examining source, which is "a physician, psychologist, or other acceptable medical source who has not examined you but provides a medical or other opinion in your case . . . includ[ing] State agency medical and psychological consultants . . . ." 20 C.F.R. § 404.1502.

The regulations and case law set forth a general preference for treating medical sources' opinions over those of non-treating medical sources, and non-treating medical sources over non-examining medical sources. *See* 20 C.F.R. § 404.1527(d)(2); *Ryan v. Heckler*, 762 F.2d 939, 942 (11th Cir. 1985). Thus, a treating physician's opinion is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford*, 363 F.3d at 1159 (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). "Good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the: "(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."

*Phillips*, 357 F.3d at 1241 (11th Cir. 2004) (citing *Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

On the other hand, the opinions of a one-time examiner or of a non-examining source are not entitled to the initial deference afforded to a physician who has an ongoing treating relationship with a plaintiff. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987). Still, medical consultants or medical experts are highly qualified medical specialists who are experts in the Social Security disability programs, and their opinions may be entitled to great weight if the evidence supports their opinions. *See* 20 C.F.R. § 404.1527(e)(2)(iii), 416.927(e)(2)(iii); SSR 96-6p. In short, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 F. App'x 410, 418–19 (11th Cir. 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

The Court must also be aware of the fact that opinions such as whether a claimant is disabled, the claimant's RFC, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a

case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's RFC. *See, e.g.,* 20 C.F.R. § 404.1546(c).

## A.    Treating Physician's Opinion

On December 9, 2016, Dr. Coleman completed a two-page document titled a "Supplemental Questionnaire," at the request of Plaintiff's attorney. (Tr. at 402-03). As the ALJ noted, Dr. Coleman circled boxes indicating that Plaintiff had "extreme" or "marked" limitations in seven out of nine functional areas, such as activities of daily living; maintaining social functioning; maintaining concentration, persistence, and pace; ability to respond to customary work pressures; and ability to respond appropriately to coworkers. (Tr. at 21, 402-03). Dr. Coleman also circled the "yes" option to the question of whether Plaintiff's limitations had lasted or were expected to last for 12 months or longer, but, as the ALJ noted, he did not in any other way relate Plaintiff's then-current impairments back to the alleged onset date, which was over three years earlier. (Tr. at 21, 403). Dr.

Coleman hand-wrote on the form that Plaintiff's medications caused drowsiness, "cognitive slowness," fatigue, and appetite changes. (Tr. at 403). Dr. Coleman apparently did not complete the "Narrative Report" that was supposed to accompany the Supplemental Questionnaire because it is not in the record. (Tr. at 402 ("This Supplemental Questionnaire is designed to amplify your narrative report and answer certain questions about the patient's residual functional capacity.")).

The ALJ gave little weight to the opinions of Dr. Coleman because there was "no support for them in [Plaintiff's] limited treatment records from Jackson County Family Medicine," where Dr. Coleman practiced. (Tr. at 21).

Substantial evidence supports the ALJ's conclusion here. On April 6, 2012, more than a year before the alleged disability onset date, Plaintiff presented to Dr. Coleman, along with her mother and husband. (Tr. at 358). She told Dr. Coleman that recently she had "an almost temporary psychosis" where she attacked her husband with a knife and then cut her left wrist very deeply. (*Id.*). Plaintiff went to the emergency room, where she received sutures and was evaluated by Mountain Lakes Behavioral Healthcare, "who thought she had bipolar disorder but made no other treatment or follow up arrangements," according to Dr. Coleman. (*Id.*). Dr. Coleman noted Plaintiff was "very emotionally distraught." (*Id.*). He assessed

"disorder, bipolar personality" and suicide attempt. (*Id.*). He asked Plaintiff "to contact Mountain Lakes to see if they are going to be able to do out[]patient or in patient treatment," and he gave her samples of Symbyax, told her to stop Paxil, and continue Xanax as needed. (*Id.*). Dr. Coleman asked Plaintiff to return in a week for follow up (*Id.*).

At the follow-up appointment on April 13, 2012, Plaintiff reported she had stabilized very quickly on Symbyax, had improved energy, no sedation, and no manic thoughts or irrational behavior. (Tr. at 359). She said her depression had "lifted some." (*Id.*). Dr. Coleman noted that Plaintiff was "much more clear and interactive today," and she had clear insight. (*Id.*). He gave Plaintiff samples of Abilify and Prozac and told her to continue Xanax and "follow up if no improvement or any worsening in condition." (*Id.*).

As the ALJ noted, from the alleged onset date of July 15, 2013, through December 2016, the treatment records from Jackson County Family Medicine, where Dr. Coleman practiced, reflect relatively infrequent visits for routine follow up. (Tr. at 21). Indeed, there is no documented medical treatment on or around Plaintiff's alleged onset date in July 2013. (Tr. at 20.) Plaintiff presented to Dr. Coleman only five times during that over-three-year period, and he never once conducted a mental status exam. (Tr. at 360, 375-79, 385-90). More significantly,

other than one general statement about Plaintiff's ability to work, which is noted below, Dr. Coleman did not identify any specific work-related limitations. (Tr. at 360, 375-79, 385-90).

Plaintiff returned to see Dr. Coleman on May 1, 2014, more than two years after her April 2012 appointment. (Tr. at 360). She and her husband described panic attacks with seizure-type movements lasting about one minute during which she remained alert. (*Id.*). Dr. Coleman continued her medications and added Lamictal at night for a week and twice a day thereafter. (*Id.*). At a follow up on October 17, 2014, Plaintiff reported that Lamictal had helped her anxiety and panic attacks "a good bit." (Tr. at 376). Over the past two or three weeks, however, she said she suddenly had worsening severe depression with side effects of galactorrhea, abnormal dreams, and urinary incontinence at night. (*Id.*). Dr. Coleman reduced her dose of Lamictal and increased Prozac. (*Id.*). He noted that "she has not gained the functional or cognitive ability to work and this has added to some of her stress and worries." (*Id.*). Dr. Coleman indicated he would see Plaintiff for follow up in two to three weeks, but Plaintiff apparently did not return until July 27, 2015, nine months later. (*Id.*).

At the July 2015 appointment, Plaintiff reported postprandial diarrhea, abdominal cramping, and cough. (Tr. at 377). She also reported increased anxiety

that week, which Dr. Coleman noted "sounds like she is more sensitive to external circumstances while she is feeling ill." (*Id.*). He also noted that Plaintiff was "over all well controlled on her current medications." (*Id.*). Dr. Coleman continued the anti-anxiety medications. (*Id.*).

Plaintiff next saw Dr. Coleman on March 22, 2016. (Tr. at 378-79). She reported feeling a moderate degree of depression and indicated she was going to be evaluated for bipolar I disorder. (Tr. at 378). Although Dr. Coleman conducted a physical exam, he did not conduct a mental status exam. (*Id.*). He recommended "titrate up on Risperdal for mood stabilizer," continue Prozac, take Xanax only three time a day (Plaintiff admitted to taking it four times a day), and take Lamictal as needed for panic attacks. (Tr. at 379).

The last time Dr. Coleman treated Plaintiff was on August 31, 2016, when she presented with sinus symptoms. (Tr. at 388-90). She did not report any problems related to her mental diagnoses. (Tr. at 388). Dr. Coleman treated her for acute sinusitis and did not note anything about her mental condition. (Tr. at 388-90).

The aforementioned evidence demonstrates that there is no support in Dr. Coleman's limited treatment notes for the extreme and marked limitations he noted in his medical source statement. (Tr. at 21, 402-03). As an initial matter, in

December 2016 when he completed the medical source statement, Dr. Coleman had not seen Plaintiff for mental follow up in more than eight months, which undermines the opinion's accuracy concerning Plaintiff's then-current functioning. (Tr. at 378, 403). Moreover, in his medical source statement, Dr. Coleman cited no evidence from his treatment of Plaintiff to support his opinion. The opinion sharply contrasts with his treatment notes, which show that Lamictal helped relieve Plaintiff's anxiety symptoms, her symptoms were overall well-controlled with medications, and that at Plaintiff's last visit regarding mental issues, she reported only a moderate degree of depression. (Tr. at 376-78).

Additionally, and as the ALJ noted, Dr. Coleman indicated in the Supplemental Questionnaire that a psychological evaluation was obtained, but he did not provide the date of the evaluation or identify the medical provider who performed it. (Tr. at 21, 403). This reference might be to an August 5, 2016, initial evaluation by a Mountain Lakes Behavioral Healthcare nurse practitioner, Belinda Herring, CRNP, who is not an "acceptable medical source" under the Social Security regulations. (Tr. at 21, 400-01). *See* 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a), (d)(1). At that evaluation, Plaintiff reported having difficulty maintaining sleep, waking with nightmares at least three times a week, low energy, low motivation, history of impulsive behaviors and poor judgment. (Tr. at 396.)

She stated that her anxiety was such that she had a history of hyperventilating with chest pain, sweating, and dizziness. (Tr. at 400.) However, CRNP Herring noted that, although Plaintiff had been seeing her primary care physician for psychiatric medications, she had never seen a psychiatrist or been in mental health treatment. (*Id.*). CRNP Herring also noted this was Plaintiff's first evaluation for mental health. (*Id.*). The mental status exam indicated some psychomotor retardation, blunted affect, a coherent thought process with some difficulty concentrating, thoughts of hopelessness, dysphoric mood, limited insight, and limited judgment. (Tr. at 21, 401). Significantly, CRNP Herring did not specify any work-related limitations due to Plaintiff's mental condition. (Tr. at 400-01).

As the ALJ concluded, these findings are inconsistent with and do not support the marked and extreme limitations as opined by Dr. Coleman. (Tr. at 21). For example, CRNP Herring noted only "some difficulty concentrating" (tr. at 401), whereas Dr. Coleman opined Plaintiff had marked deficiencies in concentration, persistence, or pace. (Tr. at 402). CRNP Herring did not note any restriction in performing daily activities (tr. at 401), whereas Dr. Coleman found extreme restriction. (Tr. at 402). CRNP Herring did not indicate any difficulties in maintaining social functioning (tr. at 401), but Dr. Coleman opined Plaintiff had extreme difficulties. (Tr. at 402). Moreover, nothing in CRNP Herring's

evaluation supports Dr. Coleman's opinion that Plaintiff had extreme limitation in the ability to respond to customary work pressures and to respond appropriately to coworkers. (Tr. at 402). Although CRNP Herring noted that Plaintiff had limited insight and judgment, this finding does not support Dr. Coleman's opinion of marked limitation in performing simple tasks in a work setting. (Tr. at 403).

In sum, the ALJ recognized that Plaintiff's bipolar disorder and anxiety disorder were severe impairments at step two of the sequential evaluation process and, to the extent the evidence supported credible work-related mental limitations, the ALJ fully accommodated them when she restricted Plaintiff to unskilled work with few workplace changes, no direct contact with the general public, and only occasional contact with coworkers. (Tr. at 17, 19). Substantial evidence in the record supports the ALJ's decision to give little weight to Dr. Coleman's opinion, and the ALJ's decision is not due to be disturbed on this ground.

### B. Consultative Examiner's Opinion

Dr. Arnold conducted a consultative mental health examination of Plaintiff on October 31, 2014. (Tr. at 364-67.) On examination, Dr. Arnold found Plaintiff to have a depressed mood with somber affect and estimated her intelligence to fall in the borderline range. (Tr. at 365). However, she also found Plaintiff's cognition, abstract reasoning, and thought processes to be normal. (Tr. at 365-66.) In the

summary section of the report, Dr. Arnold noted Plaintiff did not have panic attacks on her current medication regimen (Tr. at 366). Dr. Arnold also noted that Plaintiff is the custodial parent of her daughters and, despite her estimated borderline intellectual functioning, she has the basic skills to manage her funds. (*Id.*). Dr. Arnold diagnosed Plaintiff with post-traumatic stress disorder ("PTSD") features, mood disorder, anxiety disorder, and seizures, and she assessed a Global Assessment of Functioning ("GAF") score of 50, which indicates "serious symptoms or any serious impairment in social, occupational, or school functioning." *See* Diagnostic and Statistical Manual of Mental Disorders 4th Edition ("DSM-IV") at 32. (Tr. at 366-67.) Dr. Arnold did not specify any work-related limitations due to Plaintiff's mental condition. (Tr. at 365-67).

Plaintiff argues that the ALJ committed reversible error in failing to state the weight she was giving to Dr. Arnold's opinion. Plaintiff is correct that "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence. *Id.* "Therefore, when the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will decline to affirm simply because some rationale

might have supported the ALJ's conclusion." *Id.* (internal quotation marks omitted). In *Winschel*, the Eleventh Circuit reversed an ALJ's denial of benefits after determining that it was "possible that the ALJ considered and rejected" two medical opinions because "without clearly articulated grounds for such a rejection, we cannot determine whether the ALJ's conclusions were rational and supported by substantial evidence." *Id.*; *see also McClurkin v. Social Sec. Admin.*, 625 F. App'x 960, 962-63 (11th Cir. 2015) (unpublished) (failing to state weight given to non-examining physician's opinion constitutes reversible error).

Plaintiff is also correct that the ALJ did not explicitly state the weight she gave Dr. Arnold's opinion. However, any error is harmless because Plaintiff failed to show that Dr. Arnold's opinion in any way undermined the ALJ's findings. Indeed, the ALJ's decision reflects that she thoroughly reviewed and considered Dr. Arnold's October 2014 findings and opinion. (Tr. at 364-67). Specifically, the ALJ discussed with approval Dr. Arnold's findings in concluding at step three that Plaintiff's impairments did not meet or medically equal a listing for a mental disorder. (Tr. at 18-19). In later assessing Plaintiff's RFC, the ALJ also explicitly stated that Dr. Arnold's findings are supported by Plaintiff's treatment notes from her visits with Dr. Coleman, which reflected relatively infrequent visits for routine follow up. (Tr. at 21.) It is thus obvious that the ALJ implicitly gave significant or

great weight to Dr. Arnold's opinion. Indeed, the ALJ properly considered the opinion, did not discount the opinion or findings in any way, and the opinion and findings comport with the ALJ's findings.

Thus, *Winschel* is distinguishable from this case because here, the ALJ stated with "at least some measure of clarity the grounds" for her decision. *See, e.g., Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016) (distinguishing *Winschel* and affirming the Commissioner's decision because the court was not left pondering why the ALJ made the decision he made, noting that the court would not ignore the rest of the opinion merely due to the ALJ's failure to assign the weight to or mention a doctor's opinion); *Carson v. Comm'r of Soc. Sec.*, 373 F. App'x 986, 988-89 (11th Cir. 2010) (affirming an implicit rejection of a doctor's opinion where the ALJ's other findings on the subject matter of the opinion were clear and supported by substantial evidence); *Denomme v. Comm'r of Soc. Sec.*, 518 F. App'x 875, 878 (11th Cir. 2013) (ALJ's failure to specify weight accorded to examiners' opinions was harmless where RFC was consistent with examiners' opinions); *Caldwell v. Barnhart*, 261 F. App'x 188, 191 (11th Cir. 2008) (absence of weight was harmless error where psychologist's opinions did not contradict the ALJ's findings).

Plaintiff also contends that if Dr. Arnold's diagnoses are credible, then she would be precluded from all SGA. This contention is unpersuasive. Merely because Dr. Arnold diagnosed Plaintiff with PTSD features, mood disorder, anxiety disorder, and a GAF score of 50, does not establish that she had additional limitations due to her condition, because the mere existence of these impairments does not reveal the extent to which they limit her ability to work. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work"); *Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) ("a diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work") (citing *McCruter*, 791 F.2d at 1547).

To the extent Plaintiff specifically faults the ALJ for failing to discuss the GAF score of 50 that Dr. Arnold assessed, the Court notes that even though GAF scores have been cited in social security cases, "the Commissioner has declined to endorse the GAF score for 'use in the Social Security and SSI disability programs,' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Wind*, 133 F. App'x at 692 n. 5 (citations omitted). This is because a low GAF score by itself is not necessarily

determinative of a severe mental impairment. The GAF Scale "describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations." DSM–IV at 32. In the instant case, although the ALJ did not mention the low GAF score of 50, she did clearly discuss Plaintiff's mental impairments and explained in detail how each area was considered. There is no requirement that an ALJ refer to every piece of medical evidence in the record as long as the decision is not so broad that it fails to allow a reviewing court the ability to determine if the ALJ considered a plaintiff's medical condition as a whole. *Dyer*, 395 F.3d at 1210–1211. In this case, the ALJ considered Plaintiff's medical conditions as a whole, and did not commit reversible error in failing to include in her discussion the GAF score assessed by Dr. Arnold.

## IV. Conclusion

Upon review of the administrative record, and considering all of Ms. Fletcher's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** AND **ORDERED** ON FEBRUARY 15, 2019.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704